IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES CIFERNI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 09-3594 |
| MADISON LTD, DOMINIC GREICO, and ROBERT SMITH, | : | |
| Defendants. | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**　　　　　　　　　　　　　　　　　**SEPTEMBER 29, 2010**

　　　　Presently before the Court is the Motion for Summary Judgment filed by Defendants Madison, LTD ("Madison"), Dominic Gricco (identified in Plaintiff's Complaint as "Dominic Greico") ("Gricco") and Robert Smith ("Smith") (collectively, "Defendants"). For the reasons set forth below, Defendants' Motion will be granted.

**I.　　FACTS**[1]

　　　　Madison provides mechanical and electrical contracting services, including machine welding, structural steel erection, water treatment systems, tower modifications, pipe fabrication and scaffold services, among other services. It provides these mechanical and electrical contracting services for large-scale projects, including the construction of oil refineries. During the relevant time period, Gricco, a Madison employee, served as General Foreman for a Madison project known as the Sun Oil Project at the Sunoco Refinery in Philadelphia, Pennsylvania (the

---

[1] The following facts are undisputed.

"Refinery").² At the Refinery, Madison erected towers on which it built heaters and reactors. As General Foreman, Gricco was responsible for the safe and efficient completion of the Sun Oil Project as well as for the safety and well-being of the employees on the job. Smith, also a Madison employee, served as Field Safety Supervisor during the relevant time period. In that role, he was responsible for training individual employees on safety restrictions and auditing safety compliance.

In 2005, while working for another employer, Plaintiff James Ciferni ("Ciferni") injured his left hand in a welding accident. After the accident, Ciferni spent approximately eighteen months out of work, followed by several weeks of "light duty." By 2007, he returned to work as a welder, subject to certain medical restrictions. Ciferni's medical restrictions, as set forth by his physician, Dr. Scott Jaeger ("Dr. Jaeger"), were modified over time. On March 28, 2008, Dr. Jaeger set forth the following restrictions: (1) "sedentary work (lifting and/or carrying less than 10 pounds occasionally and 5 pounds frequently throughout the work day)"; (2) "no repetitive activities of the left upper extremity"; (3) "no ladders"; (4) "no overtime"; (5) "no vibrating tools"; (6) "no extreme temperature exposure (less than 60 degree F)"; and (7) "no left hand gripping." (Defs.' Mot. Summ. J., Ex. F.) In further describing Ciferni's medical status, Dr. Jaeger opined:

> [Ciferni] reached a plateau in his recovery and is not capable of returning to work as a boiler maker without restrictions. While he has certainly improved considerably, the work that he performed required a truly high performance that

---

² The Refinery processes and refines crude oil into petroleum products, such as gasoline, which consist of extremely hazardous and volatile chemicals. The physical plant involves extensive piping that carries large streams of fluids between processing units. Because of the volatility of the chemicals contained in the fluids, activity within the Refinery is heavily regulated by the Occupational Safety and Health Administration.

>he is no longer able to attain and these restrictions will be permanent and no further treatment will make a significant difference.

(Id. at 4.) Dr. Jaeger also stated that Ciferni "is not able to find someone who will hire him because of some of the restrictions that are necessary for his own health and well being and the well being of those around him." (Id. at 5.)

In May 2008, Madison placed a call to the local union hall requesting boilermakers to weld a heater and reactor on an elevated platform on a tower. At that point, Madison had nearly completed the Sun Oil Project and filled all of the positions, except the stainless steel tube welder position for the heater construction. Ciferni responded to Madison's call and arrived on site on May 22, 2008. He filled out new hire paperwork, received training on safety requirements and participated in orientation programs that included instruction on Madison's policies prohibiting discrimination and retaliation. After he completed these programs, but before he began any work, Ciferni handed Smith his list of medical restrictions and stated, "this doesn't mean that I [can't] do all those things." Smith then passed along Ciferni's medical restrictions to Gricco. Because the ability to climb ladders and use vibrating tools was essential to the stainless steel tube welder position, Gricco informed Ciferni that he could not allow him to work at the Sun Oil Project in that capacity. Ciferni then left the premises, contacted his union representative and filed a grievance related to his discharge.

On December 24, 2008, Ciferni filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), claiming that Madison retaliated against him because of his alleged disability. On August 6, 2009, Ciferni filed the instant action, bringing claims against Madison for disability discrimination and retaliation under the Americans

With Disabilities Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 353 (2008) (the "ADAAA") (Counts I and II), and claims against Madison, Gricco and Smith for disability discrimination and retaliation under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 et seq. (the "PHRA") (Counts III and IV).

On June 11, 2010, Ciferni was deposed. At his deposition, Ciferni stated that he has a "permanent partial disability" in that the gripping function of the ring and pinky fingers of his left hand "is not full." (Ciferni Dep. 52:10-17, June 11, 2010.) The deposition testimony continued:

> Q: How does this impairment limit you?
>
> A: It limits some of my gripping ability. My gripping ability is not equal to my right hand. But who's to say my left hand, at gripping capacity of eighty pounds, isn't greater than anybody else's in this room –
>
> Q: Well, your doctor.
>
> A: – unless I'm tested? It's a disability of my own, not that it's a national disability. If I'm not tested and if every guy on the job isn't tested, who['s] to say my eighty-pound gripping ability isn't equal or greater than ninety percent of the other boilermakers on the job?
>
> Q: Well, your doctor is saying that you can't do it, right?
>
> A: He's comparing my left to right.
>
> Q: Your doctor is saying that you can't lift – that you shouldn't be lifting or carrying more than ten pounds occasionally and five pounds frequently throughout the day, right?
>
> A: With my left hand.
>
> Q: Okay. So what sorts of activities are you limited in doing in your regular life? Is there anything or is it – you know.
>
> A: You know, I have the damndest time with keys in my left hand.
>
> Q: Okay.

A: Some very small dexterity. The toll booth people probably hate me because I'm always dropping the change. So larger stuff is easier for me to grip and smaller stuff – I actually – I kind of don't have a complete fist.

Q: So other than the toll booth and the keys, what tasks are you unable to perform . . . .

. . . .

Q: [I]t's very important that you articulate those things because this is a lawsuit that you've brought. So please go ahead and do so.

A: Well, it's been four years now, so I don't actually look at it as a disability. I look at it more that it's very challenging to make different alterations in my life. For one, at the gym. I'm not comfortable bench pressing with a straight bar or going heavy – and I'm talking heavy.

Q: What's heavy?

A: Hundreds of pounds. Hundreds. Unless it's on a machine that's balanced where if I lost my grip, it's safe.

Q: So you don't consider yourself disabled. That's what you just testified.

A: I consider myself permanently partially disabled that – it's been so long now. I've made so many different alterations and accommodations that I try not to treat my limitations as a disability. . . .

. . . .

Q: You mentioned that you had some trouble doing tasks like – I think you said washing your hair. What's the degree of difficulty that you experience in washing your hair? I mean can you still do it?

A: Yes, with my right hand. Nearly probably ninety-nine percent is with my right hand. I can with my left, but it irritates the ends of my two distals.

Q: What other things?

A: What other things?

Q: What other things are you limited – are you limited in brushing your teeth?

A:   I'm right-hand dominant. So most of my tasks are with my right hand.

(Id. at 198:15-24, 199:1-24, 201:3-24, 206:7-22.)

Finally, in his Response to the instant Motion, Ciferni states that he has "performed all the essential functions of the [stainless steel tube welder position] without accommodations in subsequent employment with Defendant Madison as well as other employers." (Pl.'s Resp. Mot. Summ. J. at 5.)

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the Court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather, that party must go beyond the pleadings and present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a

6

summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325). Further, the non-moving party has the burden of producing evidence to establish prima facie each element of its claim. Celotex, 477 U.S. at 322-23. If the Court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

## III. DISCUSSION

As an initial matter, we find that the unamended Americans With Disabilities Act, 42 U.S.C. § 12111 et seq. (the "ADA"), applies to the instant action, rather than the ADAAA, because Ciferni's cause of action arose before January 1, 2009.

"On September 25, 2008, President George W. Bush signed the ADA Amendments Act of 2008 into law." Walstrom v. City of Altoona, No. 06-81, 2008 WL 5411091, at *5 n.3 (W.D. Pa. Dec. 29, 2008) (citing the ADAAA). The legislation, which took effect on January 1, 2009, amended the ADA's definition of a "qualified individual with a disability" to extend the ADA's protection to a broader class of individuals. Bialko v. Quaker Oats, No. 08-364, 2010 WL 1330285, at *8 n.6 (M.D. Pa. Mar. 30, 2010). Nothing in the statutory language indicates that the ADAAA should apply retroactively. Amorosi v. Molino, No. 06-5524, 2009 WL 737338, at *4 n.7 (E.D. Pa. Mar. 19, 2009); see also Bialko, 2010 WL 1330285, at *8 n.6 (stating that "it appears that every court that has addressed the issue has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded its effective date"). As such, because the alleged discrimination and retaliation in this case occurred entirely in 2008, the pre-ADAAA standards apply.

"In order to make out a prima facie case under the ADA or the PHRA, the plaintiff must tender evidence which, if credited, would establish that he has a 'disability' within the meaning of the ADA." Czapinski v. Iron City Indus. Cleaning Corp., 355 Fed. Appx. 633, 634 (3d Cir. 2009). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[T]he threshold to be considered disabled under the ADA is a high standard." Parker v. Verizon PA, Inc., No. 07-435, 2007 WL 4248277, at *8 (W.D. Pa. Nov. 30, 2007). An individual cannot prove disability status under the ADA merely by submitting evidence of a medical diagnosis of an impairment. Pritchett v. Ellers, 324 Fed. Appx. 157, 159 (3d Cir. 2009) (citation omitted). Rather, a plaintiff must "have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment must also be permanent or long-term."[3] Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (citation omitted), superceded by statute, Americans With Disabilities Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 353 (2008).

With regard to the major life activity of working,

[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as

---

[3] The ADA, as amended by the ADAAA, states that major life activities include, but are not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A). The ADAAA added "eating," "sleeping," "standing," "lifting," "bending," "reading," "concentrating," "thinking" and "communicating" to the illustrative list of major life activities previously set forth by the EEOC. Alex B. Long, Introducing the New and Improved Americans With Disabilities Act: Assessing the ADA Amendments Act of 2008, 103 NW. U. L. REV. COLLOQUY 217, 222 (2008).

8

> compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). To determine whether a plaintiff is substantially limited, courts should consider: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Namako v. Acme Mkts., Inc., No. 08-3255, 2010 WL 891144, at *4 (E.D. Pa. Mar. 11, 2010) (quoting Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 179-80 (3d Cir. 2005)) (quotation marks omitted).

We find that Ciferni has failed to show a genuine issue for trial regarding whether he has a disability under the ADA. As previously stated, Ciferni explained in his deposition that he is disabled because the gripping function of the ring and pinky fingers of his left hand "is not full." (Ciferni Dep. 52:10-17, June 11, 2010.) Ciferni further stated that: (1) the "gripping ability [of his left hand] is not equal to [his] right hand," but nevertheless, his left hand has a "gripping capacity of eighty pounds"; (2) he has "the damndest time with keys in [his] left hand"; (3) he is "always dropping the change" at toll booths; (4) "larger stuff is easier for [him] to grip"; (5) he does not "actually look at [his limited gripping ability] as a disability"; (6) he is "not comfortable bench pressing with a straight bar or [lifting] . . . [h]undreds of pounds"; (7) he can wash his hair with his right hand as well as "with [his] left, but [washing his hair with his left hand] irritates the ends of [his] two distals"; and (8) he is "right-hand dominant" and "most of [his] tasks are [performed] with [his] right hand." (Id. at 198:15-24, 199:1-24, 201:3-24, 206:7-22.) Finally, Ciferni states that he has "performed all the essential functions of the [stainless steel tube welder position] without accommodations in subsequent employment with Defendant Madison as well

9

as other employers." (Pl.'s Resp. Mot. Summ. J. at 5.)

In Nealy v. Patterson Dental Supply, Inc., the plaintiff severed her ring and pinky fingers in her dominant right hand in an accident. No. 04-3287, 2005 WL 3132182, at *2 (S.D. Tex. Nov. 22, 2005). The fingers were reattached during two surgeries immediately following the accident and, ten days after the accident, the plaintiff returned to work as a customer service representative. Id. at *2-3. On the day of her return, the plaintiff's manager observed her struggling to perform various tasks associated with her employment, such as answering phones while typing orders and entering data in the computer system. Id. at *3-4. Concluding that the plaintiff could not perform her job in an efficient and timely manner, the plaintiff's manager terminated her employment. Id.

The court in Nealy found:

> [T]he uncontroverted summary judgment evidence is that Plaintiff's hand impairment for a while prevented or made it ***difficult*** for her to perform a number of daily activities, but she has not identified any tasks that her hand impairment thereafter has ***prevented or severely restricted*** her from performing except for mowing the lawn, which is not a task central to daily life. Thus, even if Plaintiff is impaired in her ability to grip or grasp objects with her right hand and experiences some restricted motion, she has not produced evidence that her impairment substantially interferes with her performance of manual tasks so as to qualify as a disability under the ADA.

Id. at *13-14 (emphasis in original). The court further reasoned that the plaintiff's impairment could not qualify as a disability under the ADA because she admitted "that she now can perform daily tasks she previously could not by relying more on her three healthy fingers and using her left hand." Id. at *14.

In this case, Ciferni has not shown that he has an impairment that "prevents or severely restricts [him] from doing activities that are of central importance to most people's daily lives."

Toyota, 534 U.S. at 198. Ciferni describes certain activities as being difficult to perform as a result of his impairment, such as handling keys, lifting "[h]undred of pounds" and handing change to toll booth operators, but has not identified any "major life activities" which he is substantially limited in performing. Moreover, unlike the plaintiff in Nealy, Ciferni suffers from a limited gripping ability in his non-dominant hand and he is able to perform "most of [his] tasks . . . with [his dominant] hand." Therefore, in light of the record before the Court, we conclude that Ciferni has failed to establish that he has an actual "disability" within the meaning of the ADA.

Ciferni also has not shown that he has a record of an impairment that substantially limits one or more major life activities. He argues that "Gricco relied solely upon the medical restrictions of Dr. Jaeger for the record of impairment," and therefore, he has established that he has a record of impairment under the ADA. We disagree.

The restrictions set forth by Dr. Jaeger do not identify any major life activities which Ciferni is substantially limited in performing. The activities which Dr. Jaeger restricted were: (1) lifting and/or carrying ten or more pounds occasionally and five or more pounds frequently throughout the work day; (2) engaging in repetitive activities of the left upper extremity; (3) climbing ladders; (4) working overtime; (5) using vibrating tools; (6) experiencing temperatures less than sixty degrees Fahrenheit; and (7) gripping with the left hand. (Defs.' Mot. Summ. J., Ex. F.) There is no indication from these restrictions that Ciferni has an impairment that "prevents or severely restricts [him] from doing activities that are of central importance to most people's daily lives." Toyota, 534 U.S. at 198. Rather, these restrictions, as well as Dr. Jaeger's

further statements,[4] only suggest that Ciferni is restricted in his ability to work as a boilermaker. As previously discussed, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Because the record of impairment in this case does not include an impairment which substantially limits one or more major life activities, Ciferni has not established that he has a "record of such an impairment" under the ADA.

Similarly, Ciferni has produced no evidence which shows that Defendants regarded him as having a disability as defined under the ADA. The Third Circuit has explained that:

> A person is "regarded as" having a disability if he: (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation; (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

Hershgordon v. Pathmark Stores, Inc., 285 Fed. Appx. 846, 848 (3d Cir. 2008) (alteration in original) (citing Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187 (3d Cir. 1999)) (finding that the record indicated that defendant only considered plaintiff "to be temporarily incapable of performing his job of night store manager"). In order for Ciferni to prevail under the "regarded as" prong with regard to the major life activity of working, he must establish that Defendants believed that he was "limited in his ability to work in either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." See id. (citation and quotation marks omitted); see also Taylor, 177 F.3d at 192 ("An

---

[4] As mentioned, Dr. Jaeger also opined that "[Ciferni] . . . is not capable of returning to work as a boiler maker without restrictions. While he has certainly improved considerably, the work that he performed required a truly high performance that he is no longer able to attain . . . ." (Defs.' Mot. Summ. J. at 4.)

employer who simply, and erroneously, believes that a person is incapable of performing a particular job will not be liable under the ADA. Liability attaches only to a mistake that causes the employer to perceive the employee as disabled within the meaning of the ADA, i.e., a mistake that leads the employer to think that the employee is substantially limited in a major life activity.").

Ciferni has not shown that: (1) Defendants treated his impairment as one that substantially limits him in performing one or more major life activities; (2) the attitudes of others toward his impairment substantially limit him in performing one or more major life activities; or (3) Defendants treated him as having an impairment that substantially limits one or more major life activities. The record before the Court merely suggests that Defendants regarded Ciferni as being unable to work on the Sun Oil Project as a stainless steel tube welder for the heater construction. As such, we conclude that Ciferni has failed to show a genuine issue for trial regarding whether Defendants regarded him as having a substantially limiting impairment as defined under the ADA.

Finally, Ciferni argues: (1) that "a '100% healed' employer policy is a per se violation of the ADA . . . . [and] Gricco made the unilateral determination that Plaintiff was not 100% healed instead of Defendant Gricco performing the individual assessment" (Pl.'s Resp. Mot. Summ. J. at 7); and (2) that "without engaging in an interactive process, Defendant Gricco's actions are tantamount to a per se violation" (id. at 8). Ciferni's arguments are unavailing.

As stated in Powers v. USF Holland, Inc., "[t]he cases before the [effective date of the ADAAA] required that the plaintiff show disability before pursuing a per se discrimination case." No. 07-246, 2010 WL 1994833, at *4 (N.D. Ind. May 13, 2010) (citing, inter alia,

Hohider v. United Parcel Service, Inc., 574 F.3d 169, 195-96 (3d Cir. 2009), for the proposition that a claim for per se discrimination for a 100% healed policy requires that a plaintiff be "disabled" or "otherwise qualified" under the ADA). Because the ADAAA does not apply retroactively to the allegedly unlawful discrimination and retaliation in this case, and because Ciferni has failed to show that he has a "disability" as defined under the ADA, we need not address the merits of his arguments regarding the per se violations alleged.

      An appropriate Order follows.